IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| LAVACE MORGAN | § | |
| v. | § | CIVIL ACTION NO. 6:21cv445 |
| LORIE DAVIS, ET AL. | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Plaintiff Lavace Morgan, an inmate of the Texas Department of Criminal Justice - Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. The named Defendants in Plaintiff's amended complaint are Beto Unit Warden William Wheat, Sgt. William Bradley, Officer Christopher Case, and Nurses Russell Kellum and Gideon Oputy. Former TDCJ-CID Director Lorie Davis was named in Plaintiff's original complaint but does not appear in his amended complaint.

**I. Plaintiff's Amended Complaint**

Plaintiff's amended complaint (docket no. 23) is the operative pleading in the case. In his amended complaint, Plaintiff states that on September 18, 2019, Sgt. Bradley and Officer Case used excessive force by "kicking, jerking, forcing to walk, dragging, and threw Plaintiff on stretcher, causing a broken T9 vertebrae." He contends that Nurses Kellum and Oputy ignored an obvious and serious danger, failed to provide emergency treatment or conduct a physical assessment test, or to report any positive or negative findings. Plaintiff says that the nurses told him "we are not picking

1

you up" and that the back board was not an option. Both nurses then moved out of the way, allowing Sgt. Bradley to act.

In listing the Defendants, Plaintiff states that Sgt. Bradley kicked him in the right leg and said "if you had back pain that would of hurt." Bradley then yanked Plaintiff to a sitting position, forced him to his feet, dragged and threw him on a stretcher. Plaintiff states that Bradley then told Nurse Oputy to place medical bags on Plaintiff's legs, saying "since he can't feel them." As a result, Plaintiff says that he suffered a broken T9 vertebrae.

Plaintiff asserts that Officer Case kicked his leg, jerked and dragged him, and threw him on the stretcher. He complains that Warden Wheat failed to ensure his safety and did not investigate, interview witnesses, or obtain incident reports, and denied his grievance by saying that the preponderance of the credible evidence did not support Plaintiff's allegations against Sgt. Bradley.

Plaintiff complains that Nurse Kellum and Nurse Oputy denied or ignored an obvious and serious danger and failed to provide emergency treatment or report any positive or negative findings. He says that the nurses did not conduct a physical assessment test and Kellum told him "we are not picking you up and only vital signs will be checked." Nurse Oputy also placed medical bags on his legs after being ordered to do so by Sgt. Bradley.

In an attached Step One grievance, Plaintiff states that on September 18, 2019, at 9:00 p.m., he fell on the floor during a dayroom count because his legs went numb due to a pinched sciatic nerve. An ICS [incident command system call, reporting the incident] was called by Officer Robinson. Shortly after the call, Sgt. Bradley and Officer Case arrived. Bradley began yelling at him to "get your ass off the floor," Plaintiff replied that he could not move, but Bradley told Robinson not to call an ICS.

After about ten minutes, Plaintiff states that Nurses Kellum and Oputy arrived, leaving the stretcher in the hallway. Oputy asked Plaintiff what was wrong and he said that he could not move because his legs were numb due to the back injury of a pinched nerve. Kellum asked him to raise up but Plaintiff said that he could not, further explaining about his pain. Plaintiff states that Kellum

2

and Oputy both knew him because he had been to the infirmary multiple times for back pain, and the nurses told Bradley his name.

However, Plaintiff complains that Sgt. Bradley disregarded his plea of tremendous back pain and his inability to move or walk. Instead, Bradley ordered him to get him and said "we aren't picking you up." Plaintiff states that he could not move, and Bradley got behind his neck with both hands under his shoulders and pushed him to a sitting position. This was followed by a "forceful throw to feet" with Officer Case's help. Plaintiff contends that this caused him tremendous pain and left him breathless.

Plaintiff states that the door to G Wing was open to the hallway where the stretcher was. Sgt. Bradley and Officer Case forced him to move his feet, but Plaintiff asked them to help him because he could not move. He was forced onto the stretcher by Sgt. Bradley.

On the way to the infirmary, Plaintiff said that the medical bag was placed on his legs by Nurse Oputy and Sgt. Bradley said "since he can't feel his legs, put the bag there." Nurse Kellum said that nothing would be done to help Plaintiff and that only vital signs would be checked. Plaintiff says that he lay in the infirmary from around 9 p.m. until 1 a.m., still in unrelieved pain. The response to this grievance, signed by Warden Wheat, reads "your allegations have been investigated. It was determined that the preponderance of credible evidence at this time does not support your allegations towards Sgt. Bradley. The unit conducted investigation has been forwarded to the Office of Inspector General (OIG) for further review. No further action is warranted." Plaintiff then filed a Step Two grievance appeal saying that the investigation was improper because there were eyewitnesses, naming three inmates. The response to the grievance appeal said that the issue had been reviewed by the Office of the Inspector General and it was determined that there was insufficient evidence to warrant opening a case. (Docket no. 23-1, pp. 1-4).

## II. The Defendants' Motion for Summary Judgment and the Response

In their motion for summary judgment, the Defendants assert that Plaintiff's claim of excessive force against Sgt. Bradley and Officer Case lacks merit because the officers did not act

maliciously and sadistically for the very purpose of causing harm, but were attempting to assist him off the floor when he said that he was unable to move. They also state that the fracture in his back likely occurred prior to his encounter with the officers.

The Defendants state that according to Plaintiff, Nurses Kellum and Oputy took him to the infirmary and told him that vital signs would be taken. They add that according to the medical records, Plaintiff was seen the next morning by a physician named Dr. Haque, who examined him and ordered X-rays which showed no rib fractures. Dr. Haque called in an urgent appointment with the neurosurgery department at Hospital Galveston for September 25 and ordered that Plaintiff have a lower bunk for 90 days. The Defendants maintain that Plaintiff has failed to show deliberate indifference to his serious medical needs by the nurses.

The Defendants also argue that Plaintiff's claim against Warden Wheat lacks merit because he did not allege that Warden Wheat was personally involved in the incident, nor did he set out any constitutionally deficient policies implemented by Warden Wheat which were the moving cause of a constitutional violation.

In his response to the motion, Plaintiff states that "TDCJ and her designees, such as Warden Wheat, vicariously implemented unconstitutional policies. The inaction by TDCJ and her designees clear show the repudiation of Plaintiff's constitutional rights and is the moving force of the constitutional violation."

Plaintiff argues that the physical injury he suffered was not *de minimis* but required hours of surgery to repair. He complains that the medical personnel stood by and allowed the officers to inflict malicious and sadistic behavior on him, and the amount of force as well as its reasonableness is subject to scrutiny and thus does not merit summary judgment as a matter of law.

Plaintiff attaches a statement by inmate Charles Davis saying that Plaintiff fell on the floor and told Officer Robinson that he was unable to move. Robinson called for a supervisor and Sgt, Bradley an on OJT [on the job trainee] came to the wing. Plaintiff told Bradley that he was unable to move and Bradley appeared upset because he had just come from F Wing where chemical agents

4

had been used.  According to Davis, Bradley began to curse and told Plaintiff to "get his ass off the floor."  This went on for a while and Bradley then called for medical assistance.  When the medical personnel arrived, they left the gurney outside instead of bringing it in.  Bradley kicked Plaintiff in the bottom of his feet and said that if his back was really messed up, those kicks would be killing him.  The OJT officer also kicked him in the foot.  The nurses asked Plaintiff questions and tried to manipulate him into getting up but he could not. Bradley then got down behind Plaintiff, put his hands under Plaintiff's shoulders, and pushed him into a sitting position. He then "snatched" Plaintiff to his feet and tried to make him walk to the gurney in the hallway. Davis states that Robinson and the nurses watched while Bradley and the OJT officer, Case, made Plaintiff move by pushing and dragging him some seven or eight feet to the gurney.

A statement by inmate Frank Williams says that he saw Plaintiff fall to the floor and remain there for several minutes while assistance was being called from the infirmary.  Bradley came in and told Plaintiff to get up and go to his cell, but Plaintiff replied that he was in a lot of pain and could not walk. Bradley asked Plaintiff if he could move his arms and then reached down, took Plaintiff by the shoulders, and lifted him from the floor, attempting to stand him on his feet.  Medical arrived and took him to the infirmary. The next time Williams saw Plaintiff, he was returning from the hospital with a walker and a long surgical cut on his back.

A statement by inmate Brandon Richardson says that he saw Plaintiff fall by the front of the dayroom door. Officer Robinson called a "flash, flash, flash." Sgt. Bradley and Officer Case arrived. Bradley looked down at Plaintiff and yelled at him about getting his ass off the floor. Plaintiff replied that he could not move.  Bradley told Robinson not to call an ICS even though she had already done so. Nurses Oputy and Kellum came to the wing, leaving the gurney in the hall. Plaintiff was asked if he could get up off the floor and he said that he could not move because of the pain in his back. Bradley again told Plaintiff to get up, and Plaintiff said that he could not move. Richardson states that Bradley said he was not going to pick Plaintiff up, but then went behind him

and picked him up anyway. Bradley got Plaintiff to his feet and forced him toward the stretcher, even though medical personnel were at the scene.

### III. The Summary Judgment Evidence

The Defendants attach an affidavit from Dr. Glenda Adams summarizing Plaintiff's medical records. According to Dr. Adams, Plaintiff first complained of back pain on August 14, 2019, about a month prior to the incident. He submitted a sick call request complaining that his blood pressure medication was affecting his back and breathing. Nurse Kellum had him triaged for musculoskeletal symptoms, but Plaintiff denied pain at that time, explaining that the pain only occurred when he took his blood pressure medication. He had no signs or symptoms of acute distress, his breathing and lungs were normal, and his movement, posture, gait, and range of motion were normal. He was referred for an appointment with a provider. (Docket no. 72-1, p. 4).

On August 18, 2019, Dr. Adams states that Plaintiff was seen in the medical department as a walk-in at 3:55 a.m. He was ambulatory but complained of left lower back pain. Plaintiff stated that he had the pain for a week and that walking or laying down aggravate it, while ibuprofen helps. He exhibited normal neurological findings and the remainder of the exam was normal, except that his blood pressure was elevated; Plaintiff reported that he had not been taking his blood pressure medications because they made his back hurt. At 6:20 a.m., his blood pressure was still elevated, and the medical staff contacted Dr. Clayton, who ordered a medication called clonidine. This was administered and Plaintiff's blood pressure went down until he was released at 7:46 a.m. (Docket no. 72-1, p. 4).

On August 29, 2019, Dr. Adams states that Plaintiff saw Dr, Haque complaining that his blood pressure medication (amlodipine) causes him back pain. An examination revealed a normal-appearing back with normal inward curvature but decreased range of motion and pain on flexion. Dr. Haque gave Plaintiff education on positive lifestyle changes and the need to control his blood pressure, as well as an illustrated handout on back exercises. Dr. Haque also discontinued the

amlodipine and increased the dosage of another medication called hydrochlorothiazide. (Docket no. 72-1, pp. 4-5).

On September 11, 2019, Dr. Adams says that Plaintiff saw Dr. Haque on a follow-up for his back pain. He told the doctor that the pain is now left-sided chest wall pain and appeared to be in mild distress. An examination showed chest muscle wall tightness and tenderness to palpation. Dr. Haque diagnosed a left thoracic strain and ordered X-rays to rule out a rib fracture, and told Plaintiff to continue naproxen for pain. The doctor also prescribed a muscle relaxer called methocarbamol. The X-rays proved negative for a rib fracture. (Docket no. 72-1, p. 5).

According to Dr. Adams, the only entry for September 18, 2019 in Plaintiff's medical records is a sick call request asking to review the rib X-rays. On the morning of September 19, Plaintiff was seen by Dr. Haque with complaints of left-sided mid-back pain and new onset numbness of both lower legs. His vital signs were normal but he appeared to be in moderate distress. His back appeared unremarkable but pain is elicited with twisting and forward flexion. Plaintiff also appeared to have decreased sensation to pin pricks on the outer surface of both lower extremities, although his deep tendon reflexes were normal. Dr. Haque contacted the University of Texas Medical Branch / Correctional Managed Care Utilization Review to arrange for an urgent appointment for Plaintiff to be evaluated at the neurosurgery clinic at Hospital Galveston. The doctor set up an appointment for Plaintiff on September 25 and assigned him a bottom bunk for 90 days. (Docket no. 72-1, pp. 5-6).

On September 25, Plaintiff was seen in the neurosurgery clinic and found to have normal strength on the right and minor weakness in the left upper and lower extremities. Spinal X-rays showed mild spondylotic changes throughout the cervical spine and no more than minimal thoracolumbar degenerative changes; however, due to the progressive nature of his symptoms, he was held over at the hospital for MRI studies of his spine.

On September 27, Dr. Adams says that the MRI studies reveal multifocal destructive osseous lesions through the thoracic spine and a pathologic fracture of T9 with soft tissue retropulsion into

the spinal canal resulting in severe canal stenosis and cord compression. These findings were believed to be most consistent with metastatic cancer or multiple myeloma. He was admitted to the hospital and on September 30, he received a surgical procedure consisting of a T8 to T10 laminectomy, decompression of the T9 pathologic fracture, and T7 to T11 posterior spinal fusion. The lesion in the T9 vertebral body was excised and the pathology report revealed a granulomatous lesion [i.e. a clump of white blood cells, often seen in response to infections or inflammation]. Laboratory studies for tuberculosis and fungal disease are negative, but because Plaintiff has a history of latent tuberculosis, a decision was made to treat him for Pott's Disease - tuberculosis of the spine. He was started on four medications for this condition and released from the hospital on October 9, 2019. (Docket no. 72-1, p. 6).

Dr. Adams explains that a "pathologic fracture" is a break in a bone which occurs when force or impact does not cause the break to happen - rather, an underlying disease leaves the bones weak and brittle. In such a case, movement or a shift of body weight can put pressure on weak bones and result in the fracture. Dr. Adams says that "the spinal tuberculosis resulted in a pathologic fracture with spinal cord compression." (Docket no. 72-1, p. 7).

Plaintiff asserted that he was in the dayroom when his legs went numb and he fell to the floor, where he could not move. Dr. Adams states that "accepting Mr. Morgan's account of September 18 as true, the described events are most consistent with Mr. Morgan having suffered a spontaneous pathological fracture prior to falling to the ground and prior to any alleged actions by security staff." She adds that "my professional opinion is that Mr. Morgan's claim that his spinal fracture was caused by excessive force by security staff on September 18, 2019 is inconsistent with (1) the course of events as he describes them, (2) the medical record, and (3) the HG Neurosurgery Clinic's diagnosis of a pathologic fracture due to Pott's Disease. In addition, the medical record indicates that Mr. Morgan was provided appropriate medical care based upon his complaints and objective clinical findings at the time." (Docket no. 72-1, p. 8).

8

Although the medical records do not contain any records showing an encounter with medical personnel on September 18, Dr. Adams says that the events as recounted by Plaintiff in his grievance show that Nurse Kellum said his vital signs would be checked, and he was kept in the infirmary for four hours. The following morning, the medical records show that he was seen by Dr. Haque, who arranged for an appointment at the neurosurgery clinic in Galveston.

Plaintiff furnishes summary judgment evidence showing progress notes dated September 27, 2019, by Dr. Aaron Mohanty in the neurosurgery clinic. These notes say that the MRI shows a pathologic fracture of T9 with soft tissue retropulsion resulting in severe canal stenosis and cord compression. Plaintiff required admission, investigation for a possible metastatic lesion, and surgery. (Docket no. 13-2, p. 1).

Plaintiff's next exhibit shows complaints of back pain and bottom lower extremity weakness, and a diagnosis of probable Pott's disease, spinal compressive myelopathy, and a T9 pathologic fracture. The hospital course notes say that Pott's disease was suspected and a decision was reached to treat for that condition. (Docket no. 13-2, p. 3). A post-surgical X-ray of the lumbar spine, dated October 30, 2019 (docket no. 13-2, p. 9) showed that spine stabilization rods were partially visualized, four non-rib bearing lumbar-type vertebral bodies were present with sacralization of L5, minimal levocurvature of the lumbar spine is present, the vertebral bodies were normal in height and normal in alignment, and no significant degenerative changes are present.

**IV. Discussion**

    A. General Standards for Summary Judgment

Summary judgment is properly granted only when, viewing the evidence in the light most favorable to the non-moving party, the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Ellis v. Garza-Lopez*, slip op. no. 23-10022, 2023 U.S. App. LEXIS 13305, 2023 WL 3723634 (5th Cir., May 30, 2023); *Burleson v. Texas Department of Criminal Justice*, 393 F.3d 577, 589 (5th Cir. 2004). If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-

9

moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial. *Id.*, *citing Allen v. Rapides Parish School Board*, 204 F.3d 619, 621 (5th Cir. 2000).

The plaintiff cannot oppose summary judgment by some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated or speculative assertions, or by only a scintilla of evidence. *Boudreaux v. Swift Transportation Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Prison Legal News v. Livingston*, 683 F.3d 201, 211 (5th Cir. 2012).

The court has no obligation to sift the record in search of evidence to support a party's opposition to summary judgment. *Adams v. Traveler's Indemnity Co.*, 465 F.3d 156, 164 (5th Cir. 2008). Instead, a party opposing summary judgment must identify specific evidence in the record which supports the challenged claims and articulate the precise manner in which the evidence supports the challenged claim. *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A properly supported motion for summary judgment should be granted unless the opposing party produces sufficient evidence to show a genuine factual issue exists. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

B. Sgt. Bradley and Officer Case

Plaintiff asserts that Sgt. Bradley and Officer Case used excessive force upon him. The Fifth Circuit has explained that the core judicial inquiry in cases alleging excessive force is whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Byrd v. Harrell*, 48 F.4th 343, 347 (5th Cir. 2022). The term "maliciously" means to intentionally do a wrongful act without just cause or excuse, with an intent to inflict injury, or under circumstances which show an evil intent. The term "sadistically" means to inflict pain for one's own pleasure. *Douglas v. Owens*, 50 F.3d 1226, 1232-33 and n.13 (3rd Cir. 1995); *Parkus v. Delo*, 135 F.3d 1232, 1234 (8th Cir. 1998). These definitions are also used in the

Fifth Circuit's Pattern Jury Instructions - Civil Cases, 2014 ed., sec. 10.7 (pp. 104-05). The prison official's subjective intent is the focus of the inquiry. *Byrd*, 48 F.4th at 347.

It should also be noted that not every malevolent touch by a prison guard gives rise to a federal cause of action. *Hudson*, 503 U.S. at 9, *citing Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir.), *cert. denied sub nom. John v. Johnson*, 414 U.S. 1033 (1973) (not every push or shove, even if it may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights). Likewise, the Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind. *White v. Coffield Medical Staff*, slip op. no. 21-40211, 2022 U.S. App. LEXIS 9562, 2022 WL 1056103 (5th Cir., April 8, 2022), *citing Wilkins v. Gaddy*, 559 U.S. 34, 37-38, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010).

Plaintiff states that he fell to the floor in the dayroom and was unable to move. Sgt. Bradley and Officer Case were called to the scene and Bradley told him roughly to get up, but Plaintiff said that he could not move. Sgt. Bradley and Officer Case kicked him in the leg and foot. When he still could not get up after several minutes, Plaintiff stated that Sgt. Bradley got behind him and pushed him to a sitting position. He was then forcefully lifted to his feet and taken to the stretcher in the hallway.

Plaintiff's pleadings, as well as the summary judgment evidence, make clear that the Defendants were not intentionally doing a wrongful act without just cause or excuse with an intent to inflict injury or under circumstances which show an evil intent, nor inflicting pain for their own pleasure. Rather, the officers were trying to raise him to his feet so he could go to the clinic for medical care. Being unable to move, Plaintiff could not get up and go to the clinic himself; he acknowledges that the officers picked him up off the floor and put him on a gurney for transport to the infirmary. While this may not have been accomplished in the most gentle of manners, Plaintiff's pleadings and the summary judgment evidence make clear that the ultimate intent of the officers was to transport him to the infirmary rather than to inflict pain for their own pleasure.

This conclusion is underscored by reviewing "the well-known *Hudson* factors." *Cowart v. Erwin*, 837 F.3d 444, 452-53 (5th Cir. 2016). These factors, set out in *Hudson v. McMillian*, 503 U.S. 1, 7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), are: (1) the extent of the injury suffered; (2) the need for the application of force; (3) the relationship between the need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any efforts made to temper the severity of a forceful response. *Baldwin v. Stalder*, 137 F.3d 836, 839 (5th Cir. 1998); *Hudson v. McMillian*, 962 F.2d 522, 523 (5th Cir. 1992).

1. The Extent of the Injury Suffered

The Fifth Circuit has explained that in order to be actionable, the amount of force used must be more than *de minimis*, provided that the use of force is not of a sort repugnant to the conscience of mankind. The plaintiff need not show serious injury, although the extent of the injury may supply insight as to the amount of force applied. *Cowart*, 837 F.3d at 453. Where the objective factors of an inmate's medical records show no evidence of any injuries consistent with the inmate's allegations, the Court may conclude that the allegations are implausible. *Wilburn v. Shane*, 193 F.3d 317, 1999 U.S. App. LEXIS 38885, 1999 WL 706141 (5th Cir., August 20, 1999) (unpublished), *citing Wesson v. Oglesby*, 910 F.2d 278, 281-82 (5th Cir. 1990).

Although Plaintiff argues that Sgt. Bradley and Officer Case fractured his T9 vertebrae, the medical records show otherwise. Plaintiff suffered a pathologic fracture, meaning that the fracture was not caused by force or impact. Instead, he says that he was in the dayroom when his legs went numb and he fell to the floor, where he could not move. The medical records and Dr. Adams' affidavit indicate that the fracture occurred spontaneously as a result of Pott's disease, resulting in the numbness and the subsequent fall to the floor prior to the arrival of the officers.

Plaintiff's self-diagnosis of a fracture caused by Sgt. Bradley and Officer Case is not sufficient to show that such a condition actually existed, particularly in light of the summary judgment evidence indicating that the fracture was not caused by force or impact. *Aswegan v. Henry*, 49 F.3d 461, 465 (8th Cir. 1995) (prisoner's self-diagnosis of a serious medical condition is

insufficient without medical evidence verifying that the condition exists); *accord, Kayser v. Caspari*, 16 F.3d 280, 281 (8th Cir. 1994) (prisoner's self-diagnosis alone will not support a medical conclusion); *McClure v. Foster*, civil action no. 5:10cv78, 2011 U.S. Dist. LEXIS 14546, 2011 WL 665819 (E.D.Tex., Jan. 7, 2011), *Report adopted at* 2011 U.S. Dist. LEXIS 15437, 2011 WL 941442 (E.D.Tex., Feb. 16, 2011), *aff'd* 465 F. App'x 373, 2012 U.S. App. LEXIS 6385, 2012 WL 1059408 (5th Cir., March 29, 2012). Plaintiff does not point to any other injuries suffered as a result of the actions of Sgt. Bradley and Officer Case; instead, he focuses on the fracture. The first *Hudson* factor weighs against him.

### 2. The Need for the Application of Force

Plaintiff states that he fell to the floor in the dayroom and was unable to move. Sgt. Bradley and Officer Case were called to the scene and Bradley told him roughly to get up, but Plaintiff said that he could not move. Sgt. Bradley and Officer Case kicked him in the leg and foot. When he still could not get up after several minutes, Plaintiff stated that Sgt. Bradley got behind him and pushed him to a sitting position. He was then forcefully lifted to his feet and taken to the stretcher in the hallway.

The need for the application of the force involved in lifting Plaintiff to his feet and moving him to the gurney is clearly evident in the fact that Plaintiff states he could not move by himself and was thus trapped on the dayroom floor in the absence of assistance. Rather than leaving him there, the officers sought to get him to a gurney so he could be transported to the infirmary.

Plaintiff also complains that the officers kicked him in the leg and on the bottom on the foot. He does not ascribe any injury or ill effect to these kicks, and in fact he asserts - and the medical records indicate - that his legs were numb and had reduced sensation. There is no indication that the kicks were done maliciously or sadistically, and in any event appear to be no more than a *de minimis* use of force. The second *Hudson* factor weighs against Plaintiff.

### 3. The Relationship Between the Need and the Amount of Force Used

Plaintiff states that Sgt. Bradley got behind his neck with both hands under his shoulders and pushed him to a sitting position. This was followed by a forceful throw to his feet with Officer Case's help. The medical records show that at the time of the incident, Plaintiff weighed 166 pounds. He was unable to get up off the floor or to move his legs, so a certain amount of force was necessary to get him up. Plaintiff describes a very rough effort in picking him up, which caused him pain; however, he had just suffered a pathologic fracture in his back, followed by a fall to the floor, so any method of picking him up would likely have resulted in pain. The third *Hudson* factor is inconclusive.

### 4. The Threat Reasonably Perceived by the Responsible Officials

Plaintiff plainly posed no threat to the officers, which is the analysis in most use of force cases. Instead, the threat in this case was to Plaintiff himself, laying on the floor in the dayroom unable to move. The officers perceived this threat and sought to take him to the infirmary. To the extent this factor is applicable to the present fact pattern, it weighs in favor of the Defendants.

### 5. Efforts Made to Temper the Severity of the Response

Plaintiff's description of the incident does not indicate that significant efforts were made to temper the severity of the response to the threat, although his belief that the Defendants caused the fracture in his back is belied by the medical records showing that the fracture was pathologic and thus not caused by force or impact. This factor weighs slightly in Plaintiff's favor.

### 6. The Core Judicial Inquiry

As noted above, the core judicial inquiry is whether the force was used in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm. Plaintiff's pleadings and the summary judgment evidence show that the officers were trying to help Plaintiff get off the floor and go to the infirmary when he could not move due to a pathologic fracture, not acting wrongly without cause or excuse or seeking to inflict pain for their own pleasure. Sgt. Bradley and Officer Case are entitled to summary judgment.

14

C. Nurse Kellum and Nurse Oputy

Plaintiff complains that the nurses failed to provide emergency treatment or conduct a physical assessment test, told him they would only take his vital signs, and did not report the incident. Dr. Adams' affidavit acknowledges that there are no medical records documenting the incident itself, but notes that there are extensive records showing the treatment Plaintiff received beginning with his visit with Dr. Haque the next morning.

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997); *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989). In order to show deliberate indifference, the prisoner must show (1) objective exposure to a substantial risk of serious harm, (2) the defendants had subjective knowledge of this substantial risk, (3) the defendants denied or delayed the prisoner's medical treatment despite their knowledge of this substantial risk, and (4) this denial of or delay in treatment resulted in substantial harm. *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019).

Disagreement about the recommended medical treatment is generally not sufficient to show deliberate indifference. *Id.*; *see also Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006), *citing Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.")

Claims of negligence, medical malpractice, or that the treatment provided has not been as successful as the plaintiff would have liked are insufficient to set forth constitutional violations. *Gobert*, 463 F.3d at 346; *Norton*, 122 F.3d at 291. Likewise, the fact that medical care given is not the best that money can buy, or that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992).

The Fifth Circuit has held a prisoner who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. *Spears v. McCotter*, 766 F.2d 179, 181 (5th Cir. 1985).

In *Domino v. TDCJ-ID*, 239 F.3d 752 (5th Cir. 2001), a prisoner expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute examination. The prisoner committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

*Domino*, 239 F.3d at 756.

In the present case, Plaintiff plainly had a serious medical need, although the extent of his condition was not discovered until later. He says that he was taken to the infirmary and kept there for some four hours, his vital signs were apparently taken, and he saw the doctor in the morning.

Plaintiff does not point to any harm which came to him as a result of the actions of Nurse Kellum and Nurse Oputy. As nurses, Kellum and Oputy cannot make diagnoses of medical conditions or prescribe therapeutic or corrective measures, including medications. *Brown v. Bolin*, 500 F.App'x 309, 2012 U.S. App. LEXIS 25433, 2012 WL 6194359 (5th Cir., December 12, 2012); Texas Occupations Code §301.002(2) (Vernon 2013). Plaintiff's new-onset condition necessarily required examination by a physician, which he received the next morning; he saw Dr. Haque, who gave him an urgent referral to the neurosurgery clinic at Hospital Galveston.

While Plaintiff asserts that his pain was not relieved while he was in the infirmary, this by itself does not show deliberate indifference on the part of the nurses. Plaintiff had suffered a

16

pathologic fracture in his back and described the pain as "tremendous." Modern medicine simply cannot relieve all pain, particularly when the medical personnel involved are nurses who cannot prescribe pain medications. *See, e.g.*, *Stitt v. Scott*, 47 F.3d 424, 1995 WL 71106 (5th Cir., January 25, 1995) (physician not deliberately indifferent because he could not cure the plaintiff's back and shoulder pain).

Plaintiff complains that Nurse Oputy placed a medicine bag on his leg during the transport to the infirmary, but he does not show how this amounted to deliberate indifference to his serious medical needs, nor does he allege any injury as a result. The injury which Plaintiff had suffered was in his back, not his leg, although the back injury caused his leg to become numb. The placing of a medicine bag on Plaintiff's leg as he lay on the gurney may have been inappropriate and unwarranted, but it does not rise to the level of a constitutional violation.

Plaintiff also complains that the nurses spoke roughly to him and showed poor bedside manner. However, poor bedside manner on the part of a medical professional does not itself demonstrate deliberate indifference. *See, e.g.*, *Jett v. Keith*, civil action no. 15-cv-215, 2015 U.S. Dist. LEXIS 93263 (W.D. La., May 19, 2015)*, Report adopted at* 2015 U.S. Dist. LEXIS 93243, 2015 WL 4395042 (W.D. La., July 16, 2015), *aff'd* 667 F.App'x 465, 2016 U.S. App. LEXIS 12470, 2016 WL 3626718 (5th Cir. July 6, 2016) (verbal abuse and insults by nurse are not an Eighth Amendment violation); *Boone v. Buchanan*, civil action no. 6:07cv242, 2008 U.S. Dist. LEXIS 21590, 2008 WL 744247 (E.D. Tex., March 19, 2008) (taunting, insults, and poor bedside manner by nurse and physician did not violate the Constitution); *Sulak v. Schafer*, civil action no. 6:18cv65, 2019 U.S. Dist. LEXIS 175381, 2019 WL 5076411 (E.D.Tex., September 19, 2019), *Report adopted at* 2019 U.S. Dist. LEXIS 174958, 2019 WL 5068451 (E.D.Tex., October 8, 2019) (dismissing claim alleging doctor and several nurses in the Texas Department of Criminal Justice insulted the plaintiff, yelled at him, threatened him, called him names, and falsely insinuated he was in a relationship with another nurse). This claim is without merit.

Plaintiff also complains that the nurses did not record any positive or negative findings. The medical records do not contain any mention of this incident, nor do they document the time which Plaintiff spent in the infirmary. While the failure to document incidents in the medical record could amount to negligence or even malpractice, and could violate TDCJ policy or even state law, such failure does not amount to a constitutional violation. *See Richmond v. Director of Nurses*, civil action no. 19cv645, 2020 U.S. Dist. LEXIS 20174, 2020 WL 584305 (S.D.Ill., February 6, 2020) (nurse's failure to document an unsuccessful attempt to dislodge an ear obstruction was at most negligence and not deliberate indifference); *Raynor v. Washington*, civil action no. 3:22cv1193, 2023 U.S. Dist. LEXIS 57909, 2023 WL 2757565 (D.Conn., April 3, 2023) (failure by physician and three nurses to create a medical incident report did not rise to the level of a constitutional violation). Nurse Kellum and Nurse Oputy are entitled to summary judgment.

### D. Warden William Wheat

Plaintiff complains that Warden Wheat "failed to take immediate steps to initiate the required reporting procedures - i.e. in I-127 Step One grievance response, Assistant Warden William Wheat states "the preponderance of credible evidence at this time does not support your allegations against Sgt. Bradley." As a result of his breach of duty, Plaintiff's due process and equal protection is violated."

Plaintiff attaches his Step One and Step Two grievance forms to his amended complaint. The response to the Step One grievance, signed by Warden Wheat, says "your allegations have been investigated. It was determined that the preponderance of credible evidence at this time does not support your allegations towards Sgt. Bradley. The unit conducted investigation has been forwarded to the Office of Inspector General for further review. No further action is warranted." (Docket no. 23-1, p. 1).

Plaintiff's Step Two grievance appeal says that the investigation was "improper" and that there are eyewitnesses, including Davis, Williams, and Richardson, who would support his allegations. The response to the Step Two grievance appeal stated that the issue was reviewed by

the Office of the Inspector General and that office determined that there was insufficient evidence to warrant opening a case. No further action would be taken.

Although Plaintiff complains that Warden Wheat "did not take immediate steps to initiate the required reporting procedures," the grievance response to which he points says that the unit conducted an investigation and the results of this investigation were forwarded to the Office of the Inspector General.  Plaintiff does not indicate what other reporting steps he believes Warden Wheat should have undertaken.

More pertinently, Plaintiff's dissatisfaction with the response to his grievance or the results of the unit investigation does not show a constitutional violation. *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (no protected liberty interest in having grievances resolved to the prisoner's satisfaction); *Taylor v. Cockrell*, 92 F.App'x 77, 2004 U.S. App. LEXIS 2397, 2004 WL 287339 (5th Cir., February 12, 2004) (complaint of failure to investigate a grievance falls short of establishing a federal constitutional claim).

Plaintiff also contends in his response to the motion for summary judgment that "TDCJ and her designees, such as Warden Wheat, vicariously [sic] implemented unconstitutional policies." He does not identify any such policies, much less demonstrate how these policies resulted in a constitutional violation.  *See Spiller v. City of Texas City, Texas Police Department*, 130 F.3d 162, 167 (5th Cir. 1997) (in order to satisfy the cause in fact requirement, the plaintiff must allege that the custom or policy served as the moving force behind the constitutional violation at issue or that his injuries resulted from the execution of the policy or custom; the description of the policy or custom and its relationship to the underlying constitutional violation cannot be conclusory, but must contain specific facts). Warden Wheat is entitled to summary judgment.

E. Qualified Immunity

The Defendants have invoked the defense of qualified immunity in their motion for summary judgment. In order to overcome qualified immunity, a plaintiff must allege facts showing that the government official violated a constitutional right and that the right was clearly established at the

time of the challenged conduct.  *Laviage v. Fite*, 47 F.3d 402, 405 (5th Cir. 2022). The Fifth Circuit has explained as follows:

> Qualified immunity shields government officials from civil liability in their individual capacity so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It protects 'all but the plainly incompetent or those who knowingly violate the law.' *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986).
>
> Our qualified immunity inquiry is two-pronged. *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020). First, we ask whether the facts, viewed in the light most favorable to the party asserting the injury, show that the official's conduct violated a constitutional right. Second, we ask whether the right was 'clearly established.' *Id.* We can analyze the prongs in either order or resolve the case on a single prong. *Id.*

After explaining that a right is "clearly established" only if it is sufficiently clear that every reasonable official would have understood that the defendant's conduct violated that right, and that there must be adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that the conduct is definitively unlawful, the Fifth Circuit went on to state:

> When an official raises qualified immunity on summary judgment, as Sheriff Castloo did here, the plaintiff bears the burden of showing that the defense does not apply. *See Bryant v. Gillem*, 965 F.3d 387, 391 (5th Cir. 2020). To meet that burden, the plaintiff must present evidence, viewed in her [i.e. the plaintiff's] favor, satisfying both qualified immunity prongs by showing that the defendant (1) violated a constitutional right (2) that was clearly established at the time of the defendant's conduct. *See id*.

*Cunningham v. Castloo*, 983 F.3d 185, 190-91 (5th Cir. 2020); *Byrd*, 48 F.4th at 346 (when a government official has asserted qualified immunity, the burden shifts to the plaintiff to rebut the defense by establishing that the official's allegedly wrongful conduct violated clearly established law and that genuine issues of material fact exist regarding the reasonableness of the official's conduct). Conclusory allegations are insufficient to overcome the qualified immunity defense. *Williams-Boldware v. Denton County, Texas*, 741 F.3d 635, 643-44 (5th Cir. 2014).

Plaintiff has failed to meet his burden of overcoming the qualified immunity defense because he has not presented competent summary judgment evidence showing that the Defendants violated a clearly established constitutional right.  While there is no doubt that in general terms, the right to

be free from excessive force and deliberate indifference to serious medical needs was clearly established in 2019, the uncontroverted summary judgment evidence does not show a violation of this right, nor that any reasonable prison officials or medical personnel would have known that the conduct of the Defendants was unlawful. The Defendants are entitled to qualified immunity from suit.

<u>RECOMMENDATION</u>

It is accordingly recommended that the Defendants' motion for summary judgment (docket no. 72) be granted and the above-styled civil rights lawsuit dismissed with prejudice.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

So ORDERED and SIGNED this 13th day of June, 2023.


K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE

21